UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BIG RIVER INDUSTRIES, INC. | DOCKET NO. _____ |
| VS | JUDGE: |
| HEADWATERS RESOURCES, INC. | MAGISTRATE: |

*********************************************************************

## COMPLAINT

Plaintiff, Big River Industries, Inc.("BRI"), files this Complaint against Headwaters Resources, Inc. ("Headwaters"). In support of the Complaint, Plaintiff respectfully shows the Court as follows:

### JURISDICTION AND VENUE

I.

Federal Question Jurisdiction. Pursuant to 28 U.S.C. 1331, this Court has federal question jurisdiction as this action arises under the Sherman and Clayton Acts, 15 U.S.C. 1 *et seq.* and 15 U.S.C. 12 *et seq.*, respectively. Supplemental jurisdiction over the state law causes of action set forth herein arises under 28 U.S.C. 1367, in that state law claims are so related to the federal question claims that they form part of the same case or controversy.

II.

Venue. Venue in this district is proper as 15 U.S.C. 22 provides that an antitrust action against a corporation may be brought in any district court in a district where the defendant resides or is found or has an agent. Pursuant to information and belief, Defendant transacts business, is found, and has an agent in this district.

III.

Personal Jurisdiction. Personal jurisdiction over Defendant exists because Defendant transacts business in the State of Louisiana and has an agent for service of process in this district establishing sufficient minimum contacts with this judicial district for this Court to maintain jurisdiction over Defendant.

## PARTIES

IV.

Plaintiff, Big River Industries, Inc., is a corporation organized and existing under the laws of the State of Louisiana with its registered domicile address listed as 320 Somerulos Street, Baton Rouge, LA 70802.

V.

Defendant, Headwaters Resources, Inc., is a Utah Corporation licensed to and doing business in Louisiana with CT Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808, listed as its registered agent for service of process in Louisiana.

## BACKGROUND FACTS

VI.

On July 24, 1979, Big River Industries, Inc. ("BRI") entered into an Ash Marketing Agreement with Cajun Electric Power Cooperative, Inc. ("Cajun") to develop a market for the fly ash to be produced by the 3 coal-fueled units at Cajun's newly constructed Big Cajun II power station in New Roads, LA. (RX-1). As noted in the 1979 AMA, there was no market for the fly ash at the time and the parties had not been able to determine the quality or value of the fly ash to be produced at the facility. (RX-1; Section 7). Consequently, Cajun relied upon BRI to develop the market for the fly ash produced at Big Cajun II.

VII.

In the years that followed, BRI developed the market for fly ash and entered into several successive marketing agreements with Cajun. These successive marketing agreements provided that BRI would have the sole right to market the fly ash produced at Big Cajun II along with a right of first refusal to meet the terms and conditions of other potential purchasers of Cajun's fly ash upon the expiration of the existing marketing agreement.  The successive marketing agreements further provided that the marketing agreement would be binding upon Cajun's successors and assigns. BRI, therefore, had a right-of-first refusal with regard to any future fly ash marketing contract related to Big Cajun II and Cajun's assigns were required to honor BRI's right-of-first refusal.

VIII.

On March 31, 2000, a bankruptcy court approved the assignment of the marketing agreement between BRI and Cajun to Amended AMA-2 from Cajun to Louisiana Generating, LLC ("LaGen").  Consequently, LaGen and BRI entered into an Ash Marketing Agreement with LaGen.

IX.

On June 1, 2001, LaGen and BRI entered into an Amended Ash Marketing Agreement which extended the termination of the Ash Marketing Agreement to December 31, 2008. All terms and conditions of the prior Ash Marketing Agreement remained effective.

X.

Prior to the expiration of the Amended Ash Marketing Agreement, Headwaters contacted LaGen to obtain an exclusive right to sell and market the fly ash produced at Big Cajun II. Specifically, on or about August 21, 2007, Gloria Clark of LaGen began communicating with Headwaters in order to determine whether Headwaters could take over the marketing of fly ash at Big Cajun II.

XI.

In the August 21, 2007 email, Headwaters advised LaGen that Headwaters' offer for Big Cajun II was lucrative because Headwaters could solidify its hold on fly ash across the I-10 corridor if it obtained the Big Cajun II contract and that obtaining such a hold would enable Headwaters to demand a higher price for fly ash. Headwaters recognized that if it obtained an exclusive relationship with LaGen it could monopolize the fly ash business across the I-10 corridor in direct violation of state and federal anti-trust laws.

XII.

The I-10 corridor is one of the largest commercial markets in the United States. As a result, the federal and state agencies are continuously funding construction projects in that market which require the use of fly ash or products, such as concrete, which contain fly ash. In fact, most of the concrete in this market is required to contain fly ash and there is no substitute product for fly ash in this market.

XIII.

Although LaGen was already negotiating a new Ash Marketing Agreement with Hedwaters, LaGen issued a REQUEST FOR PROPOSAL with regard to the fly ash marketing contract at Big Cajun II on October 28, 2008. The new contract was scheduled to begin on January 1, 2009 and LaGen anticipated that it would award the new contract by November 18, 2008.

XIV.

Section 6.1 of the INSTRUCTIONS TO PROPOSERS provided that a proposer could not modify its proposal after the due date. LaGen also informed proposers to submit their best and

final price. Since BRI had the right-of-first refusal with regard to the new contract, BRI should not have been required to submit a proposal because it had the right to match the proposal submitted by the other suitors. At the urgence of Headwaters, who had already identified a scheme to prejudice BRI and monopolize free trade along the I-10 corridor, LaGen instructed BRI that it was required to submit a proposal in order to exercise the right-of-first refusal.

XV.

Headwaters, BRI, and Charah, Inc. were the only 3 proposers for the new contract. LaGen determined that Charah's proposal was non-competitive and did not consider it. As a result, LaGen considered only 2 proposals. Since the parties had entered into confidentiality agreements, LaGen was prohibited from providing BRI's proposal information to Headwaters.

XVI.

While Headwaters had planned to monopolize the market for fly ash across the I-10 corridor by obtaining the LaGen contract, BRI submitted the most competitive bid with regard to LaGen's request for proposals at that termination of the Ash Marketing Agreement that was in effect between BRI and LaGen. LaGen, however, contends that Headwaters clarified and offered an alternative proposal on or about December 9, 2008. Again, Headwaters' was furthering its conspiracy and attempt to monopolize the market. The only thing standing in its way was BRI. In fact, LaGen advised BRI that Headwaters had submitted a new proposal but that the new proposal was not submitted in writing. While this proposal was not in accord with the REQUEST FOR PROPOSAL and INSTRUCTIONS TO PROPOSERS issued by LaGen, it was nevertheless considered by LaGen and on December 15, 2008, LaGen sent a letter to BRI containing the terms of Headwaters' verbal proposal, and instructed BRI that it was required to agree to match the terms by 4:00 p.m. on December 17, 2008.

XVII.

On December 16, 2008, BRI requested a copy of the proposals submitted by the other suitors. LaGen, however, refused to provide BRI with the proposals even though it was required to have written proposals. LaGen then sent the new Ash Marketing Agreement to BRI on December 23, 2008.

XVIII.

While BRI agreed to match the terms of Headwaters' proposal, Headwaters continued its conspiracy and monopoly efforts by continuing to negotiate with LaGen and convince LaGen that they were willing to continue dropping their price as long as LaGen continued to match such that they would eventually run the price so low that BRI would fail and Headwaters could move in and raise the price for fly ash. LaGen continued to negotiate with Headwaters and exchanged a draft Exclusive Marketing Agreement ("EMA") with Headwaters on January 8, 2009. On

January 12, 2009, BRI agreed to match Headwaters' purported proposal even though it believed the same was quite lopsided and was not the result of an arms-length transaction. Surprisingly, though, after BRI agreed to match the terms of Headwaters' alleged proposal, Headwaters continued to negotiate with LaGen. In fact, on the same day that BRI agreed to match Headwaters' offer, Headwaters submitted yet another offer on January 12, 2009.

XVIII.

Ultimately, BRI agreed to match the offer submitted by Headwaters and BRI and LaGen entered into an Exclusive Marketing Agreement on January 29, 2009. The EMA contained the terms allegedly proposed by Headwaters and were significantly different than the terms proposed by BRI.

XIX.

As Headwaters had hoped, its conspiracy efforts ultimately drove BRI to a point of failure. While Headwaters was unable to prevent BRI from matching its contract terms, it made sure that the contract terms were such that BRI would be unable to make a profit. Headwaters ensured this would happen by cutting the price of fly ash in the I-10 corridor to a level that it was certain that BRI could not generate enough revenue to comply with the terms of the marketing agreement that BRI was required to match.

XX.

Due to the actions of Headwaters, BRI was unable to comply with the terms of the marketing agreement and on February 10, 2010, LaGen notified BRI that it was in default under the terms of the marketing agreement for failing to tender the appropriate compensation.

XXI.

In order to try and continue to market fly ash produced at Big Cajun, BRI requested relief from LaGen to which LaGen refused. Instead, LaGen notified BRI that its procurement policies required that such an important contract be competitively bid. Accordingly, LaGen notified BRI that new proposals would be submitted on November 29, 2010 and that the new Exclusive Marketing Agreement was scheduled to begin on January 1, 2011.

XXII.

On January 11, 2010, BRI sent a letter to LaGen requesting information regarding the new EMA because it was continuing to labor under the old Exclusive Marketing Agreement. In that letter, BRI stated that it would consider the EMA terminated as of January 21, 2011 if LaGen did not issue a new EMA. Via letter dated January 17, 2011, LaGen stated that it accepted BRI's "notice of termination" instead of providing BRI with the results of the November 29, 2010 rebid.

XXIII.

As noted in correspondence from LaGen, LaGen was well aware that BRI's letter was not an attempt to terminate the contract and that BRI was simply attempting to obtain information regarding the new EMA. In fact, LaGen expected that BRI would not be able to meet the fly ash minimums so LaGen would be able to hold BRI in default and terminate the EMA.

XXIV.

As a result of promises made by Headwaters about the money that LaGen could expect to receive if Headwaters was able to "solidify [Headwaters'] hold on ash across the I-10 corridor," LaGen had determined that it was going to award the Exclusive Marketing Agreement to Headwaters and never made any effort to negotiate with or contact BRI about the new exclusive marketing agreement. In fact, LaGen celebrated by stating "Headwater wins!" as it knew it would benefit greatly from Headwaters' monopoly over the I-10 corridor. Moreover, the terms of LaGen's contract with Headwaters closely resembled the relief requested by BRI.

XXV.

Headwaters began marketing fly ash at Big Cajun II on January 22, 2011 and announced its first price increase on February 15, 2011. Between January 22, 2011 and September 30, 2011, Headwaters increased the price of fly ash being marketed from Big Cajun from $17.00/ton to $26.00/ton. Headwaters was able to implement these price increases even though there is an excess supply of fly ash, which is a waste byproduct, and demand for fly ash was steadily declining throughout the United States.

## **FEDERAL AND STATE ANTITRUST VIOLATIONS**

XXVI.

BRI asserts that Headwaters violated the applicable Federal and State antitrust laws through its deliberate and intentional acts to monopolize the commercial market for fly ash within the I-10 corridor and that Headwaters' actions were an unreasonable restraint on trade intended to eliminate competition for fly ash sales in the I-10 corridor.

XXVII.

Federal and state antitrust laws were enacted for the protection of competition. *Citations omitted.* Moreover, federal and state antitrust laws were intended to be sweeping in breadth, encompassing every act, conspiracy, contract or combination thereof that restrains trade. *Citations omitted.*

XXVIII.

The Sherman Act, 15 U.S.C. 1, *et seq.*, proscribes contracts, combinations and conspiracies in restraint of trade or commerce, as well as any person who shall monopolize, attempt to monopolize or conspire to monopolize. Section 1 of the Sherman Act, 15 U.S.C. 1 provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States, or with foreign nations, is hereby declared illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared illegal shall be deemed guilty of a felony....

Section 2 of the Sherman Act, 15 U.S.C. 2 provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among several States, or with foreign nations, shall be deemed guilty of a felony....

Section 2 creates three offenses: monopolization, attempted monopolization, and conspiracy to monopolize.

XXIX

The Clayton Act, 15 U.S.C. 12, *et seq.*, also proscribes contracts, actions, and conspiracies in restraint of trade or commerce. 15 U.S.C. 13 specifically provides in pertintent part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: ...

Additionally, 15 U.S.C. 13a provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or contract to sell, which discriminates to his knowledge against competitors of the purchaser, in that, any discount, rebate, allowance, or advertising service charge is granted to the purchaser over and above any discount, rebate, allowance, or advertising service charge available at the time of such transaction to said competitors in respect of a sale of goods of like grade, quality, and quantity; to sell, or contract to sell, goods in any part of the United States at prices lower than those exacted by said person elsewhere in the United States for the purpose of destroying competition, or eliminating a competitor in such part of the United States; or, to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.

XXX.

The Clayton Act, 15 U.S.C. 12, *et seq.*, also allows for the recovery of treble damages, costs and attorneys' fees as well as injuctive relief for any person injured by reason of violations of antitrust laws.

XXXI.

As a result of the actions set forth above, Headwaters obtained the market power needed to monopolize the fly ash market in the I-10 corridor. Since fly ash is a unique product and a necessary component in concrete mix designs in this market, LaGen and Headwaters have been able to raise the price of fly ash above a competitive level. In fact, LaGen and Headwaters have been able to significantly increase the price of fly ash even though demand for fly ash has been decreasing and the supply of fly ash has remained stable.

XXXII.

Headwaters actions are in clear violation of both the Sherman Act and the Clayton Act and BRI is therefore entitled to an award of treble damages as well as all costs and attorneys' fees incurred in this matter.

XXXIII.

In addition to the Sherman Act and Clayton Act violations, Louisiana has enacted antitrust laws. Louisiana's antitrust statute, LSA-R.S. 51:122, provides that every contract or conspiracy in restraint of trade or commerce is illegal. LSA-R.S. 51:121 defines "commerce" as trade or commerce within the geographic boundaries of Louisiana. The anti-monopoly statute is specifically set forth in LSA-R.S. 51:123 and provides that no person shall monopolize, attempt to monopolize, or conspire with any other person to monopolize any part of the commerce within the State of Louisiana. These statutes are virtually identical to Sections 1 and 2 of the Sherman

Antitrust Act, 15 U.S.C. 1, *et seq*. Under LSA-R.S. 51:137, any person or entity injured in its business by any person or entity that violates Louisiana's antitrust statute may recover 3 times its damages plus litigation expenses.

XXXIX.

Prior to Headwaters' antitrust violations set forth above, BRI earned an average of $591,243.40 per year by marketing the fly ash produced at Big Cajun II. BRI would have earned a similar amount for an additional seven years, the life of the contract, had Headwaters had not violated federal and state antitrust laws as set forth above. Accordingly, pursuant to 15 U.S.C. 15 and LSA-R.S. 51:137, BRI is entitled to recover damages of $12,416,111.40 plus attorneys' fees and costs from Headwaters.

**TRIAL BY JURY**

XL

Plaintiff, BRI, specifically requests a trial by jury on all claims asserted herein.

**PRAYER FOR RELIEF**

XLI.

WHEREFORE, Plaintiff, Big River Industries, Inc., respectfully requests that Defendant be cited to answer and appear herein and that after due proceedings are had, that the Court grant Plaintiff treble damages for all past, present and future losses sustained as a result of Defendant's actions pursuant to the Sherman Act, Clayton Act, and Louisiana Antitrust Law, along with all costs of this suit and attorneys' fees, as well as any other relief the Court deems just and proper.

Respectfully Submitted:

By: /s/Michael T. Beckers
    Brent P. Frederick (#25053)
    Michael T. Beckers (#30197)
    Danielle N. Goren (#34563)
    DODSON, HOOKS & FREDERICK, APLC
    112 Founders Drive
    Baton Rouge, LA 70810
    Telephone: (225) 756-0222
    Facsimile: (225) 756-0025