## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA

**BIG RIVER INDUSTRIES, INC.**

**CIVIL ACTION**

**VERSUS**

**NO. 13-212-JJB**

**HEADWATERS RESOURCES, INC.**

## RULING ON DEFENDANT'S MOTION TO DISMISS

This matter is before the Court on a Motion to Dismiss (doc. 10-1) pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by Defendant, Headwaters Resources, Inc. ("Headwaters"). Plaintiff, Big River Industries, Inc. ("BRI"), has filed an Opposition (doc. 14), to which the Defendant has filed a Reply (doc. 17). BRI then filed a Sur-reply (doc. 20). In Plaintiff's Opposition, BRI has argued the sufficiency of its claim, and, alternatively, requested leave to amend any allegations that this Court deems insufficient. Oral argument is not necessary. The Court's jurisdiction exists pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 pendent jurisdiction as to Plaintiff's state law claims. For the reasons stated herein, the Defendant's Motion to Dismiss (doc. 10-1) is DENIED and the Plaintiff's request for leave to amend (doc. 14 at 28-30) is GRANTED.

### I.    Background

BRI brought this action pursuant to the Sherman Act, 15 U.S.C. §§ 1 and 2, the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13, and parallel Louisiana state laws, La. Rev. Stat. Ann. §§ 51: 121, 122, 123, and 137.

Defendant's Motion to Dismiss is brought on the following grounds: (1) BRI's claims are insufficiently pled, (2) BRI fails to state a predatory pricing claim because the allegations inadequately address the relevant market(s), market power, and barriers to entry, (3) BRI cannot establish below-cost pricing, (4) BRI fails to allege that Headwaters conspired to restrain trade

and to attempt monopolization through collusion with Louisiana Generating, LLC ("LaGen"), (5) BRI has not alleged the requisite elements of a civil price discrimination claim and has no other right to action under the Clayton Act, and (6) BRI's state law claims fail for the same reasons that the Sherman Act claims fail and because such claims are barred by Louisiana's applicable one-year liberative prescription period under La. C.C. art. 3492.

The following facts are from the Complaint (doc. 1) and are accepted as true for the purposes of this motion. *See Bass v. Stryker Corp*., 669 F.3d 501, 507 (5th Cir. 2012).  BRI initially entered into an Ash Marketing Agreement ("AMA") with Cajun Electric Power Cooperative, Inc. ("Cajun") on July 24, 1979 to develop a market for fly ash to be produced at the Big Cajun II power station in New Roads, Louisiana.  (Doc. 1, ¶ VI).  Subsequent marketing agreements gave BRI an exclusive right to market Big Cajun II fly ash and a right-of-first-refusal of future marketing contracts.  (Doc. 1, ¶ VII).  In 2000, a bankruptcy court approved the assignment of the existing marketing agreement from Cajun to LaGen.  (Doc. 1, ¶ VIII).  A year later, BRI and LaGen entered into an amended AMA which extended the existing agreement until the end of 2008. (Doc. 1, ¶ IX).  Before the extended marketing period expired, Headwaters contacted LaGen seeking to replace BRI as the exclusive marketer of Big Cajun II fly ash.  (Doc. 1, ¶ X).  During discussions with LaGen on August 21, 2007, Headwaters stated, in an unidentified email to LaGen, that an exclusive agreement between the two would place Headwaters in a lucrative marketing position, allowing it to demand a higher price for fly ash in the "I-10 corridor".[1]  (Doc. 1, ¶ XI).  The "I-10 corridor," one of the largest commercial markets in the United States, contains no substitute for fly ash and most of the federal and state construction projects continuously arising therein require its use.  (Doc. 1, ¶ XII).

---

[1] Although the facts of this Complaint are accepted as true for the purposes of this motion, the Court recognizes the contested nature of this claim and encourages Plaintiff to ponder the propriety of including such allegations in its amended pleading.

While negotiating with Headwaters, LaGen issued a request for proposals ("RFP") for a new fly ash marketing contract with an anticipated award date of November 18, 2008 and commencement date of January 1, 2009.  (Doc. 1, ¶ XIII).  Although BRI had a right-of-first-refusal, LaGen, at Headwaters' insistence, required BRI to submit a proposal in order to exercise that right.  (Doc. 1, ¶ XIV).  Three entities submitted proposals (Headwaters, BRI, and Charah, Inc.), and LaGen, deeming the latter non-competitive, only considered the proposals of Headwaters and BRI.  (Doc. 1, ¶ XV).  BRI submitted the most competitive bid, but on December 9, 2008, Headwaters "clarified and offered" a new proposal, which LaGen considered in violation of the RFP Instructions to Proposers.  (Doc. 1, ¶ XVI).  On December 15, 2008, LaGen notified BRI of Headwaters' latest proposal and informed BRI that it would be required to match.  *Id.*  Despite BRI eventually agreeing to match Headwaters' latest proposal, LaGen continued to negotiate with Headwaters, receiving another draft Exclusive Marketing Agreement ("EMA") on January 8, 2009.  (Doc. 1, ¶ XVIII).  Four days later, after BRI matched the proposal, Headwaters submitted another offer, which BRI ultimately matched on January 29, 2009.  (Doc. 1, ¶ XVIII(2)).[2]  This agreement contained terms proposed by Headwaters that were significantly different from the terms proposed by BRI.  *Id.*

BRI was unable to comply with the terms of the marketing agreement and eventually defaulted on February 10, 2010.  (Doc. 1, ¶ XX).  BRI, desiring to try and continue to operate under the agreement despite default, requested relief that LaGen later refused.  (Doc. XXI).  Thereafter, BRI informed LaGen that it would consider the EMA's original terms terminated as of January 21, 2011 unless LaGen issued a new EMA to BRI.  (Doc. 1, ¶ XXII).  LaGen responded by accepting BRI's "notice of termination," rather than by issuing a new EMA.  *Id.*

---

[2] The Complaint contains two paragraphs numbered XVIII.  Citations denoting the second will contain "(2)".

Headwaters began marketing fly ash produced at Big Cajun II on January 22, 2011 and subsequently increased the price of fly ash between February 15, 2011 and September 30, 2011. During this time period, the price of fly ash increased from $17.00 per ton to $26.00 per ton, despite there being a national surplus of fly ash and a concomitant decline in demand nationwide. (Doc. 1, ¶ XXV).

## II.    Legal Standard

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(B)(6).  When reviewing the complaint, the court must accept all well-pleaded facts in the complaint as true.  *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995).  Additionally, a reviewing court must confine its analysis to the allegations made in the complaint and its attachments.  *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011).  In order to survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While the plaintiff is not required to prove its entire case at this preliminary stage of litigation, it must allege sufficient factual matter for the court to determine whether or not the plaintiff's claim has crossed the line from speculative to plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Twombly*, 550 U.S. at 570).

## III.    Discussion

BRI claims that the Defendant conspired with LaGen to monopolize, and then successfully monopolized, the market for fly ash in the I-10 corridor in violation of §§ 1 and 2 of the Sherman Act and the RPA.  To support these claims, BRI alleges that the Defendant engaged in anticompetitive conduct including predatory pricing, collusive exclusive dealing, and price

discrimination.  Since the standards applicable under these acts are distinct, these claims will be addressed individually in turn.

**A.  Monopolization Under Section 2 of the Sherman Act**

Section 2 of the Sherman Act applies to unilateral firm activity.  15 U.S.C. § 2.  Specifically, it proscribes conduct that would monopolize, attempt to monopolize, or conspire to monopolize the relevant market.  *Id.*  To state a claim for *monopolization*, the plaintiff must allege that the defendant: (1) possesses monopoly power in the relevant market and (2) willfully acquired or maintained that power.  *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 481 (1992).  To state a claim for *attempted monopolization*, the plaintiff must allege that: (1) the defendant has engaged in predatory or anticompetitive conduct, (2) the defendant had a specific intent to monopolize, and (3) there existed a dangerous probability that the defendant would achieve monopoly power in the relevant market.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Finally, to state a claim for *conspiracy to monopolize*, the plaintiff must allege that: (1) the defendant had the specific intent to monopolize, (2) a combination or conspiracy to monopolize existed, (3) there was an overt act in furtherance of the combination or conspiracy, and (4) there was an effect upon a substantial portion of interstate commerce.  *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000).

The measure of proof for each claim is distinct.  *See generally Vaughn Medical Equipment Repair Services, L.L.C., v. Jordan Reeses Supply Co.*, 2010 WL 3488244, at *9-10 (E.D. La. Aug. 26, 2010).  That said, all of the claims will require an analysis of the relevant market and the possession of, or possibility to acquire, market power.[3]  Therefore, the Court will

---

[3] The Fifth Circuit has not explicitly stated whether or not an analysis of the relevant market is required to support a conspiracy to monopolize claim. *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 797 (5th Cir. 1995).

evaluate BRI's claims in light of market definition and market power before addressing the individual elements of each claim.

### a. Market Definition

The relevant market is determined by analyzing the relevant geographic and product markets. *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 626-28 (5th Cir. 2002). The Fifth Circuit has recognized that a trial court may dismiss a § 2 claim for a plaintiff's failure to define the relevant market. *Id.* at 628 (explaining that the deficient market definition may be grounds to grant a motion to dismiss a § 2 claim).[4]  The Complaint must account for cross-elasticity of demand, i.e., whether a product is "reasonably interchangeable by consumers for the same purposes." *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 417 (5th Cir. 2010).  A plaintiff must offer evidence demonstrating where consumers currently purchase the product and where alternative products or alternative sources of the product could be found if a competitor raises prices. *Doctor's Hosp. v. Southeast Med. Alliance*, 123 F.3d 301, 311 (5th Cir. 1997); *see also Apani*, 300 F.3d at 628 (explaining that geographic market "must correspond to the commercial realities of the industry and be economically significant.").

---

However, Fifth Circuit courts have found that an analysis of the relevant market is necessary to determine if the defendant had the requisite specific intent. *See Beef Industry Antitrust Litigation*, 907 F.2d 510 (5th Cir. 1990); *Total Ben. Services, Inc. v. Group Ins. Admin., Inc.* 875 F.Supp 1228, 1234 (E.D. La. 1995).  If a conspiracy would not be economically feasible in the relevant market, it tends to show that the defendant did not intend to create a monopoly. *Id.; see also Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.* 475 U.S. 574, 592-94 (1986) (reemphasizing that "courts should not permit factfinders to infer conspiracies when such inference are implausible…").

[4] According to the Fifth Circuit,
> Whether a relevant market has been identified is usually a question of fact; however, in some circumstances, the issue may be determined as a matter of law. Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted.

*Apani*, 300 F.3d at 628 (internal quotations and citations omitted).

The Complaint describes the relevant market in vague terms, failing to define both the necessary geographic and product characteristics.  Turning first to the relevant geographic market, Plaintiff describes the relevant geographic market as the "I-10 corridor".  Though the Court can comfortably infer notice of the claim's relationship to interstate commerce from this description, little more can be extracted.  Defendant contends that BRI's alleged market fails to meet the standards of a notice pleading because the term "I-10 corridor" does not denote any specific, unambiguous geographic region.  Additionally, the Defendant argues that the "I-10 corridor" does not allege the relevancy of any corresponding geographic area to the market for fly ash, and finally that Plaintiff's descriptions of this market are fatally inconsistent.

BRI fails to sufficiently define the geographic limitations of the "I-10 corridor," even as revised in its Opposition to Defendant's motion to include the "corridor" from "Houston, Texas to Mobile, Alabama," because this description provides no economically significant bounds to North or South and fails to address whether consumers can practically turn to other geographic areas or to competing suppliers from outside the area.  In order to "solidify its hold" on a market, one must necessarily not have had previous control over that market, thus this statement allows the inference that there is more than one player in this fly ash market.  (Doc. 1, XI).  Yet, the Complaint fails to allege specific facts regarding the number of competitors, the "area of effective competition," *Apani*, 300 F.3d at 628, and whether competing suppliers face barriers to entry effectively barring movement into the market.

The Complaint also fails to sufficiently define the relevant product market.  Granting all factual inferences in Plaintiff's favor, BRI nevertheless fails to propose a relevant product market with reference to all interchangeable substitute products or to the cross-elasticity of demand for the particular variety of fly ash marketed by the present parties.  *Id*.  BRI references fluctuations

in a national fly ash market, as well as an initial period of time in which fly ash was not yet marketable, and then merely asserts that "there is no substitute product for fly ash in this market," should that market be defined.   (Doc. 1, XII).   Plaintiff fails to differentiate the contemporary relevant fly ash market by its pertinent characteristics of elasticity or substitutability and asserts an unsupported legal conclusion of the product's reasonable interchangeability.  *Leegin*, 615 F.3d at 417.  An analysis of Defendant's monopolistic conduct is critically dependent upon the sufficiency of the definition of the relevant market.  Without these elements, the Court cannot analyze whether the Defendant has market power in the relevant market, whether barriers to entry exist in the market, or whether Defendant can or has maintained monopoly power in the relevant market.  Greater specificity will be required in BRI's amended complaint.

### b.  Market Power

The Court agrees with Headwaters' contention that BRI's Complaint must be dismissed for failure to allege sufficient facts regarding Headwaters' market power.  This conclusion must be reached since the Court has found that the Complaint insufficiently defines the relevant market.  Such a definition is necessary to assessments of market power.  *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1386 (5th Cir. 1994).

Market power is the ability to raise prices or exclude competition in the relevant market.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  Market power may be measured by a firm's control over market share or some characteristics that allow a large share to be controlled by that firm even without a disproportionate share of it.  *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984).  A plaintiff must show that a

defendant had a "legally significant share of the market" in order to establish monopolization or attempted monopolization under § 2 of the Sherman Act. *Pastore*, 24 F.3d at 490.  In addition to market share, measuring market power requires consideration of "the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994).  These additional factors to statistical market share are important because, absent barriers to entry, there is no way to exclude competition thereby controlling prices. *See Roy B. Taylor*, 28 F.3d at 1388.

Plaintiff asserts that Headwaters cut the price of fly ash in order to drive BRI's revenue stream unsustainably low.  (Doc. 1, XIX).  Once Headwaters secured the contract with LaGen, the Complaint states that Headwaters raised prices for a period of time, despite an excess supply and declining demand "throughout the United States."  (Doc. 1, XXV).  The Court recognizes that some inference of Headwaters' market power could be drawn from these assertions of price control, but only if the Court assumes their applicability to the relevant market by calculating the relationship between the national supply and demand for fly ash and that of the "I-10 corridor." Additionally, the inference of Headwaters' dominant market position may be drawn from BRI's assertion that Headwaters' tactics placed it in default.  The Court, however, is left to analyze insufficiently pled assertions regarding each factor of market domination.  BRI must amend to provide further factual support of Headwaters' purported control of market prices in the relevant market.

The Complaint also fails to define any current barriers to entry in the relevant market, a key factor in a market power analysis.  Plaintiff contends that "most of the concrete in this market is required to contain fly ash" and that "there is no substitute for fly ash in this market."

9

(Doc. 1, XII).  BRI leaves the Court to wonder at the composition of the concrete not defined as "most" in this market and to the basis of this proposed market-wide requirement.  The Court recognizes that fly ash is a classification of coal combustion residual, of which a few exist and are used in the production of concrete.  Although the class of fly ash supplied by LaGen may be so highly preferred, or "required," in the relevant market to create barriers to entry, the Complaint cannot rest upon a naked assertion of its non-substitutable nature.

It is possible that the claimed decline and subsequent rise in fly ash prices successfully excluded competitors for a time, but that assertion does not provide any sustained barrier.  Furthermore, it cannot be properly taken that such a barrier is "large enough to trigger judicial concern" without a sufficiently described relevant market.  *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 531 (5th Cir. 1999); *see also Doctor's Hosp.*, 123 F.3d at 311 (explaining that a description of relevant market, including availability of competitor substitutes, is of critical importance).  BRI must amend its Complaint to include more specific allegations regarding the definition of the relevant market, the number of competitors in the market, and the current state of competition.  Although courts do not require a specific market share percentage to warrant recovery for a § 2 claim, BRI must provide specific allegations supporting that the Defendant's relevant market share is significant.  Finally, BRI must provide further specifics as to why the Defendant has legally significant market power given (1) the nature of the relevant market(s) and (2) Defendant's market share therein.

Now that the relevant market analysis pertinent to each of BRI's claims has been addressed, the Court turns its attention to the elements of BRI's remaining § 2 claims.[5]

### c.  Attempt to Monopolize

BRI asserts that the exclusionary conduct through which Headwaters allegedly attempted or gained a monopoly is predatory pricing.  It is difficult for a plaintiff to successfully bring a predatory pricing claim.  *FMC Corp.*, 170 F.3d at 528 (recognizing that "the standard for inferring an impermissible predatory pricing scheme is high.").  This is because, to be successful, a plaintiff must demonstrate that the predatory pricing scheme was plausible, or economically feasible. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 595 (1986).

Predatory pricing occurs when "[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Brooke Group Ltd. V. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221 (1993).  Under § 2 of the Sherman Act, two prerequisites of predatory pricing recovery must be alleged: (1) the defendant's pricing is below an appropriate measure of its costs, and (2) there is a dangerous probability that the defendant will recoup any losses sustained during the below-cost pricing period.  *Id.* at 222-24.[6]  The focal point of any predatory pricing claim is the element of probable recoupment.  *Matsushita,* 475 U.S. at 589 ("The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the

---

[5] To avoid redundancy, the Court summarily finds that BRI failed to state a claim of monopolization under Section 2.  As previously addressed, BRI has failed to allege facts regarding the relevant market which is necessary to determine whether or not the Defendant had the requisite monopoly power.

[6] While § 2 of the Sherman Act condemns "predatory pricing when it poses a dangerous probability of actual monopolization," the RPA "requires only that there be a reasonable possibility of substantial injury to competition before its protections are triggered." *Brooke Group*, 509 U.S. at 222 (internal quotations and citations omitted).

predator's losses and to harvest some additional gain.") (emphasis in original).  For this reason, the Court will focus its analysis on the probability of recoupment.[7]

### i.  Recoupment

A plausible claim of recoupment requires that the pleadings show: (1) that the predatory scheme "could actually drive the competitor out of the market," and (2) "…evidence that the surviving monopolist could then raise prices to consumers long enough to recoup his costs without drawing new entrants to the market." *FMC Corp*., 170 F.3d at 528-29.  BRI argues that it has pled facts sufficient to meet the first prong of recoupment because it was eliminated from the relevant fly ash market as a result of Defendant's lowball price bidding and that Headwaters is certain to recoup associated losses because there are no relevant substitutes.  The Defendant contends that (1) BRI fails to allege that Headwaters' pricing, before or after winning the solicitation, was below cost, (2) BRI fails to allege facts regarding the relevant market, and (3) BRI has failed to support its legal conclusion that the relevant market contains absolute barriers to entry because there is no substitute for fly ash.  The Court agrees with the Defendant.

First, the Complaint must be amended to adequately support that Headwaters' alleged predatory conduct drove BRI out of the market.  Adequate definitions of the relevant market and Defendant's market power are essential to an analysis of Headwaters' conduct and associated impact upon BRI.  The Court's analysis will proceed under the assumption that a relevant market

---

[7] Though focusing its analysis on the probability of recoupment, the Court also finds that BRI failed to plead facts sufficient to support that the Defendant's price fell below an appropriate measure of their costs or that the Defendant acted with specific intent to gain monopoly power.  Accordingly, BRI must amend its Complaint to include facts sufficient to define the relevant market, the associated substitutability of fly ash, and allege that Headwaters' pricing was predatory, i.e., below some "appropriate measure" of cost. *Brooke Group*, 509 U.S. at 223.  This Court, following the "long embraced: standard adopted by the Fifth Circuit, considers an "appropriate measure" of cost to be the average variable cost. *FMC Corp.,* 170 F.3d at 528.

exists and that Defendant has sufficient market power to warrant antitrust concern under § 2 of the Sherman Act.

BRI appears to allege that it was driven out of the market by the Defendant's "price-squeezing" scheme.  Defendant contends that BRI has failed to allege "price-squeezing" as part of its anticompetitive conduct claim.  Although BRI has not done so with requisite specificity, Defendant incorrectly asserts that BRI has not alleged that Headwaters took part in predatory bidding in the upstream market.  The Court is not wholly persuaded that this case merely consists of "an instance of a wholesaler replacing one exclusive distributor with another."  (Doc. 10-1, p. 18).  BRI alleges that it was eliminated from the fly ash market after Headwaters engaged in predatory bidding with LaGen to minimize the profitability of that enterprise for BRI, and then ensured its elimination by "cutting the price of fly ash in the I-10 corridor to a level that it was certain that BRI could not generate enough revenue" to maintain operations.  (Doc. 1, XIX).  At this stage of the litigation, however, BRI has not adequately addressed market power or market definition.  While it is possible that the Defendant's bidding and pricing practices could have constituted a predatory "price-squeeze," and that BRI's elimination from the fly ash market was the result of Headwaters' practices, greater specificity will be required in the amended Complaint to permit a fuller analysis.

Second, the Complaint must be amended to provide sufficient facts supporting the probability that the Defendant could charge supracompetitive prices for a period of time long enough to recoup the losses suffered as a result of the below-cost predatory pricing period. *Brooke Group*, 509 U.S. at 225.  Courts will not condemn behavior where it appears likely that a predator's plan will fail to be profitable, because such behavior "produces lower aggregate prices in the market, and consumer welfare is enhanced."  *Id.*  The Defendant asserts that BRI's

13

allegations are not sufficient to show that recoupment is plausible because BRI has provided insufficient factual support regarding market definition and the potential for future barriers to entry.  Defendant also argues that BRI fails to allege that Defendant took part in predatory pricing because BRI does not allege that it engaged in below-cost pricing.

If barriers to entry are not significant, as the monopolist raises market prices to its own benefits, new competitors will enter the market under that inducement.  It is, in fact, the condition of the market following the defendant's removal of rivals to which courts should turn in analyzing predatory pricing claims.  *Cargill, Inc. v. Monfor of Colorado, Inc*., 479 U.S. 104, 119 n. 15 (1986).  It is then that the monopolist may charge supracompetitive prices and the existent barriers might well "prove insignificant," and the antitrust charge unworthy of litigation. *Id*.  Assuming that BRI alleged below-cost pricing, it has not alleged facts sufficiently supporting any barriers to entry in the relevant market that would likely allow Headwaters to recoup the losses sustained by such predatory practices.  The barriers to entry alleged by BRI include only the naked assertions that there are no substitutes to fly ash in the relevant market and that Headwaters exercised monopolistic market power when it raised its prices after acquiring the LaGen contract without inducing any entries into the relevant market.  To support BRI's prediction that Headwaters will maintain a monopolistic hold upon the relevant market, additional facts to show how the particular market is susceptible to a monopoly takeover is essential.  *Felder's Collision Parts, Inc*., 2013 U.S. Dist. LEXIS 55097, at *20, (explaining the critical necessity of market definitions when assessing the recoupment prong of predatory pricing allegations).  The Defendant correctly contends that the latter assertion cannot survive a motion to dismiss as pled because the relevant market power and definition have not been provided,

making assessment of the claim's plausibility impossible.  BRI must address the deficiencies described by amendment.

After discussing the recoupment element under the predatory pricing analysis, the Court returns to the remaining elements of an attempt to monopolize claim under § 2.

### ii. Specific Intent to Achieve Monopoly Power

"The intent must be to do more than compete vigorously; vigorous competition is precisely what the antitrust laws are designed to foster."  *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 887 (5th Cir. 1984).  BRI must show Headwaters' specific intent to acquire and exercise the power to fix price or exclude competition.  *Id*.  BRI asserts that Headwaters planned and conspired to monopolize the relevant market by acquiring the LaGen contract through predatory pricing.  Defendant did not contest this issue in its Motion to Dismiss.  Therefore, the Court will reserve analysis of Headwaters' specific intent to engage in conduct contrary to provisions of the Sherman Act for review of BRI's allegations of conspiracy to monopolize under § 2 of the Sherman Act.

### iii. Dangerous Probability of Obtaining Monopoly Power

The third element of an attempted monopolization claim requires a plaintiff to show whether there is a dangerous probability of the defendant obtaining monopoly power through anticompetitive conduct.  The Court finds that the above analysis of the recoupment prong of the predatory pricing element applies equally here.  BRI's amended complaint must provide further factual support regarding the Defendant's market power, its ability to hold market control at the exclusion of competitors, and its associated ability to recoup losses from the alleged predatory conduct.

### d.      Conspiracy to Monopolize

BRI claims that Headwaters made its intent known to monopolize the market by pointing to an email sent by Headwaters to LaGen, in which Headwaters outlined that if it could "solidify its hold" on fly ash along the I-10 corridor, both entities would reap lucrative financial rewards. (Doc. 1 ¶XI)   However, this contested email, without more, does not allege enough factual matter to state a valid claim.   In order for a plaintiff to show that there was intent to monopolize, the plaintiff must demonstrate that the monopoly was plausible, or, economically feasible. *In re Beef Industry Antitrust Litigation*, 907 F.2d 510, 515 (5th Cir. 1990).   Economic feasibility is determined by an analysis of the defendant's market power in the relevant market.   *Total Ben. Services Inc. v. Groups Ins. Admin., Inc.* 875 F.Supp. 1228, 1234 (E.D. La. 1995). As previously discussed, BRI has failed to allege facts tending to show the relevant market that the defendant has conspired to monopolize or relevant conditions thereof.   Therefore, BRI must address these deficiencies by amending their complaint.

### B.  Vertical Restraint of Trade Under Section 1 of the Sherman Act

Section 1 of the Sherman Act prevents concerted activity in the form of any contract, combination, or conspiracy in restraint of trade. 15 U.S.C. §1.   A claim of conspiracy or agreement to unreasonably restrain trade in contravention of § 1 of the Sherman Act requires the provision of factual support, taken as true, to suggest that an agreement was made.   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).   "An allegation of parallel business conduct and a bare assertion of conspiracy will not suffice to state a claim" and "without more, parallel conduct does not suggest conspiracy…" *Id*. at 557-58.   The elements of an unreasonable restraint on trade are (1) the defendant engaged in conspiracy, (2) the conspiracy had effect of restraining trade (3) the

trade was restrained in the relevant market and (4) there was a causal antitrust injury. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc.*, 200 F.3d 307 (5th Cir. 2000).

BRI claims that the negotiations and the resulting exclusive distributor agreement between Headwater and LaGen constituted an unreasonable vertical restraint of trade.  BRI further alleges that this was done because Headwaters convinced LaGen that the arrangement would ensure that Headwater monopolized the market which would be lucrative for both parties.  Courts evaluate most vertical restraints under a rule of reason analysis. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36 (1977).  A decision to unilaterally transfer one's business from one entity to another is normally adjudged to be legitimate under the *Colgate* doctrine. *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1113-1115 (5th Cir. 1979).  However, this decision will come under judicial scrutiny if it is made for an anticompetitive goal or purpose such as "to acquire a monopoly…or to establish market dominance and drive out existing competitors…" *Id.* at 1115-16 (citations omitted).  "The requirement of illegitimate purpose or effect marks the distinction between concerted activity which is an innocent aspect of business and concerted activity which is inimical to competition." *Id.*

Here, BRI has failed to allege facts supporting this claim.  Instead of alleging specific factual matter, BRI has merely made a bare assertion that LaGen and Headwaters entered into a conspiracy.  Furthermore, BRI has not alleged facts to support that the exclusive distributor agreement had any anticompetitive effects on the relevant market.  As discussed previously, such facts would need to show the competitive climate in the market, including, the number of competitors, the barriers to entry, and whether there are available substitutes.  To the contrary, BRI has focused on the anticompetitive effects that the arrangement has had on its own business ignoring that it is axiomatic that the antitrust laws are meant to protect competition *not*

competitors. *Brooke Group*, 509 U.S. 224 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).  Therefore, BRI must amend its Complaint to plead more sufficient facts.

### C.  Price Discrimination Under the RPA

To establish a claim under the RPA, a plaintiff must show: (1) sales made in interstate commerce, (2) the commodities sold were of like grade and quality, (3) the defendant-seller discriminated in price between buyers, and (4) that the price discrimination had a prohibited effect on competition. *Infusion Res., Inc. v. Minimed, Inc*., 351 F.3d 688, 692 (5th Cir. 2003). The complained-of injury[8] must flow from a defendant's acts of price discrimination, which is "merely a price difference." *Water Craft Management, L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 526 (M.D. La. 2004) (citing *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 559 (1990)). Price discrimination is "defined as charging different buyers different prices for the same items." *Id*.

The Defendant argues that BRI has failed to allege facts to address any of these elements. However, the Complaint does support an inference that sales were made in interstate commerce as it alleges that both BRI and the Defendant operate in the "I-10 corridor" which denotes interstate commerce.  It is not necessary at this stage for BRI point to specific customers to whom the Defendant sold commodities of like grade and quality.  It is however necessary for BRI to allege facts demonstrating that the commodities were of like grade and quality, the defendant discriminated in price among buyers, and the price discrimination had an effect on competition.  BRI has failed to allege any of these requisite facts.

Finally, to the extent that BRI asserts a claim under Section 13a of the Clayton Act, this claim is not viable.  More commonly referred to as Section 3 of the Robinson-Patman Act, this

---

[8] Two basic types of injury are recognized under the RPA: primary-line injury and secondary-line injury. *Infusion*, 351 F.3d at 692. A primary-line injury results when one seller's acts of price discrimination between favored and disfavored buyers results in an injury to a market player competing at the same level of direct competition. *Water Craft*, 361 F. Supp. 2d at 565. A secondary-line injury results from a seller's price discrimination between favored and disfavored buyers. *Infusion*, 351 F.3d at 692.

statute is a means for the Department of Justice to criminally enforce the statute and is wholly inapplicable here. *See  Native Am. Distrib. V. Seneca-Cayuga Tobacco Co.,* 546 F.3d 1288, 1298 (10th Cir. 2008) ("[P]laintiff's may not bring a civil claim under §13a because it is reserved for criminal enforcement by the Department of Justice.") (citation omitted).  Therefore, BRI may not proceed with this claim.

### D.  Louisiana Antitrust Claims

In addition to its claims under federal law, BRI brings several claims under the Louisiana antitrust statutes.  BRI alleges that the Defendant has violated La. R.S. 51:122 and La. R.S. 51:123 which are the functional equivalents of §§1 and 2 of the Sherman Act.  As a result of the statutes' similarity, "Louisiana courts have turned to the federal jurisprudence analyzing those parallel federal provisions for guidance." *Southern Tool & Supply, Inc. v. Beerman Precision, Inc.,* 826 So.2d 271, 278 (La. App. 4 Cir. 2003).  For this reason, the preceding discussion is relevant and BRI must amend its Complaint for the same reasons mentioned in the foregoing analysis.

Additionally, the Defendant asserts that BRI's state law claims fail because the claims have not been brought within the applicable prescriptive period.  In response, BRI argues that the prescriptive period did not begin to run until BRI became aware of the alleged illegal activity, or in the alternative, until the time that the continuing tort ended.  The Louisiana Civil Code does not explicitly set a liberative prescriptive period within which a plaintiff must institute an antitrust action.  *State ex rel. Ieyoub v. Bordens, Inc.*, 684 So.2d 1024. 1026 (La. App. 4 Cir. 1996).  That said, the Louisiana Supreme Court has held that an antitrust action is analogous to a tort and therefore the one-year prescriptive period for torts is applicable to antitrust actions. *Loew's, Inc. v. Don George, Inc.,* 110 So. 2d 553 (La. 1959).

Prescription begins to run at the time that the cause of action accrues unless an exception applies. *Corsey v. State, Through Dept. of Corrections*, 375 So. 2d 1319, 1321 (La. 1979).  One such exception, the doctrine of *contra non valentem*, suspends the running of the prescriptive period when the cause of action is not known or reasonably knowable by the plaintiff. *Id.* at 1322.  Generally, the party excepting on the basis of prescription has the burden to prove that the prescriptive period has lapsed. *Campo v. Correa*, 828 So. 2d 502, 508 (La. 2002).  However, when the cause of action is prescribed on the face of the pleadings, the burden shifts to the plaintiff to show that the action has not been prescribed.  *Id.*  To satisfy this burden, "the plaintiffs must initially allege facts with particularity which indicate that the injury and its causal relationship to the alleged misconduct were not apparent or discoverable until within the year before the suit was filed." *Id.* at 509, n.9.  Another exception to the general rule is the continuing tort doctrine which acts to delay the beginning of a prescription period in complex business torts until the continuing tort ceases. *State ex rel Ieyoub*, 684 So. 2d at 1027.

BRI argues that *contra non valentem* applies here because it was not aware of the Defendant's conduct until April 25, 2012 when discovery that was gathered in a separate litigation revealed evidence of the potential misconduct.  In the alternative, BRI argues that the monopoly that the Defendant currently maintains is a continuing tort and the prescriptive period will not begin to run until the tort ceases.  In response, the Defendant argues that BRI knew of all of the relevant facts supporting its claim no later than January of 2011 and therefore BRI had inquiry notice of any potential misconduct at that time.  The Defendant further argues that the continuing tort doctrine is inapplicable in the present case.  The Court agrees with the Defendant that the continuing tort doctrine is wholly inapplicable here because the continuing tort doctrine requires that there be continuous wrongful action, not just continuing ill effects. *Crump v. Sabine*

*River Auth.,* 737 So. 2d 720, 728 (La. 1999) ("A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act."); *State ex rel. Ieyoub*, 684 So. 2d at 1027 ("There must be continuing acts coupled with continued damages.").  Here, the last alleged illegal act occurred in January 2011.  As to the viability of the *contra non valentem* doctrine, the Court reserves findings on this issue until BRI submits its amended Complaint, wherein, BRI must allege facts with particularity to satisfy its burden to prove that the state law claims are not prescribed.

### E.   BRI's Request For Leave to Amend

BRI has requested leave to file an amended complaint to cure any deficiencies that the Court may find.  The Defendant, in reply, argues that BRI's request should be denied because BRI has not properly requested leave to amend and any amendment that BRI could make would not aid it in making out a claim.  Accordingly, the Defendant maintains that BRI's request should be denied.

While it is true that "a bare request in an opposition to a motion to dismiss…does not constitute a motion for [leave to amend]," *Pension Fund v. Integrated Electrical Services, Inc.,* 497 F.3d 546, 555-56 (5th Cir. 2007) (citations omitted), district courts may allow plaintiffs at least one opportunity to cure any deficiencies found in the pleadings before dismissing their case. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir. 2002). A court may deny a request to amend to avoid "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Pension Fund*, 497 F.3d at 556 (citation omitted).

Despite Defendant's argument to the contrary, the Court does not believe that allowing BRI to amend its claim would be futile.  Though the Complaint is deficient in many ways, there are enough factual allegations, taken as true, that give reason for some suspicion.  As previously mentioned, the Court is not wholly convinced that, given the alleged circumstances, this was an innocent replacement of one exclusive distributor with another.  Therefore, the Court is inclined to grant BRI's request for leave to amend.

## IV.    Conclusion

Accordingly, Defendant's Motion to Dismiss (doc. 10) is DENIED, and Plaintiff's request for leave to amend (doc. 14) is GRANTED.

Signed in Baton Rouge, Louisiana, on September 11, 2013.

_____

**JUDGE JAMES J. BRADY**

**UNITED STATES DISTRICT COURT**